## GENSER v. RECONSTRUCTION FINANCE CORPORATION.
### No. 439.

United States Emergency Court of Appeals.

Heard at Los Angeles, Cal., March 25, 1948.
Decided June 10, 1948.

William U. Handy, of Los Angeles, Cal. (Paul S. Crouch, of Eagle Rock, Cal., on the brief), for complainant.

Tobias G. Klinger, Sp. Asst. to U. S. Atty., of Washington, D. C. (Joseph M. Friedman, Sp. Asst. to Atty. Gen., and George Arthur Fruit, Atty., Department of Justice, of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

McALLISTER, Judge.

Complainant operated a slaughterhouse in Imperial Valley, California. As required by law, he applied to the appropriate division of the Department of Agriculture for an official grader to grade his meat. An official grader was provided by the Department of Agriculture and on certain specified days each week this grader reported to the complainant and graded the meat that had been slaughtered. On or about December 26, 1945, the United States Department of Agriculture notified the complainant that "the services of an official grader are not immediately available and until such services are available you are permitted to grade all the beef, veal and lamb slaughtered in your plant, in accordance with OPA Maximum Price Regulation 169 and Revisions." No official grader was furnished the complainant until January 21, 1946. During that period complainant graded his meat and submitted the proper records to the Reconstruction Finance Corporation for December, 1945, showing that the meat killed between December 26 and December 31, 1945, had been graded by the slaughterer under Section 1364.411(c) (2) (i) Maximum Price Regulation 169[1] by reason of his inability to obtain an official grader during that period. Complainant was paid by the respondent for the month of December 1945 the full subsidy provided under sub-paragraph (d) of Section 7003.5 Revised Regulation No. 3, Defense Supplies Corporation[2] as though all meat slaughtered during that month had been graded by an official grader of the Department of Agriculture.

---

[1] 10 F.R. 6182; 10 F.R. 15416. MPR 169. Section 1364.411(c) (2) (i).

"No person shall sell, offer to sell, deliver or break any beef or veal carcass irrespective of grade unless such carcass has been examined and graded by an official grader of the United States Department of Agriculture in accordance with the 'Rules and Regulations of the Secretary of Agriculture Governing the Grading and Certification of meats, etc.' as modified to the extent set forth in Appendix B hereof, and as required by Section 4002.2 of O. E. S. Regulation 1. However, in any instance where any person is unable to procure the services of an official grader within 24 hours after such person has made an application for grading, pursuant to Section 3 of Regulation No. 4, (Grading Service) contained in Section 1364.527 hereof, then the provisions of this subparagraph shall not apply, for so long a period as the Food Distribution Administration of the United States Department of Agriculture certifies in writing that *it is* unable to provide such person with the services of an official grader. During such period such beef and veal carcasses *shall* be graded by the seller in the same manner provided in Paragraph (a), (b), (c) (1) and (c) (2) of this Section 1364.411." (Emphasis added)

[2] 10 F.R. 11154. Section 7003.5 of Rev. Regulation No. 3 DSC, Livestock Slaughter Payments. Rates of Payment * * *

(d) Government Graded Cattle. "Defense Supplies Corporation will make payment on approved basic claims for cattle which report cattle by grades as graded by an official grader of the United

Complainant subsequently submitted subsidy claim to respondent for the accounting period of January, 1946, showing that for the period from January 1, to January 21, 1946, the said complainant had graded his own meat in accordance with the provisions of Section 1364.411(c) (2) (i), but the respondent refused to pay the subsidy provided under subparagraph (d) of Rev. Regulation No. 3 DSC, for the period from January 1, to January 21, 1946, but paid to the complainant the lower subsidy provided by subparagraph (e).

Upon refusal of respondent to pay the subsidy claimed, complainant filed protest with respondent, which was denied, and thereafter petitioned this court for a review of respondent's determination.[3]

Complainant contends that under a proper interpretation of Section 7003.5, Revised Regulation No. 3, he should have been paid under the provisions of subparagraph (d) thereof for the entire period during which the United States Department of Agriculture was unable to provide him with an official grader, and that the order refusing to pay him under subparagraph (d) was invalid.

The Reconstruction Finance Corporation, respondent, insists that the meaning of the regulations in question is clear and unambiguous and leaves no room for construction and interpretation. It is, therefore, submitted that because complainant graded his meat, he is not entitled to the higher subsidy granted to slaughterers whose meat was graded by an official grader of the United States Department of Agriculture but is confined to the lesser subsidy allowed to self-graders.

■ Complainant has not attacked the validity of the regulations. He contends that if they are interpreted according to the contention of respondent, they would be invalid, because unreasonable, unjust, and contrary to the intent and purposes of the price control laws; but he submits that, properly interpreted, the regulations are valid and consonant with the objectives and purposes of the Emergency Price Control Act.[4] The controversy thus presents a question of interpretation enmeshed with validity. Although the question of interpretation is ordinarily not cognizable by this court, nevertheless, where it is contended that the interpretation which the Administrator has adopted renders invalid a regulation which, if properly interpreted, would be valid, the court must pass upon the meaning of the regulation before coming to the question of validity. See Alan Levin Foundation v. Bowles, Em.App.E. C.A.1945, 152 F.2d 467, Conklin Pen Co. v. Bowles, Em.App.E.C.A.1946, 152 F.2d 764. What we have before us, then, is the complainant's protest against the determination of the Reconstruction Finance Corporation that he is not entitled to the full subsidy under Section 7003.5(d) of Revised Regulation No. 3, Defense Supplies Corporation, but only to the lesser subsidy under subsection (e) of that regulation. In

States Department of Agriculture, at the following separate grade rates:

(1) Claims reporting cost. On claims reporting cost of cattle in accordance with Section 7003.7(b) of this regulation:

| | |
|---|---|
| AA or choice | 3.00 cents a pound |
| A or good | 2.95 cents a pound |
| B, commercial or medium | 1.90 cents a pound |
| C, utility or common | 1.25 cents a pound |
| D, or cutter and canner | 1.25 cents a pound |
| Bulls or cutter and canner grade | 1.25 cents a pound |

*   *   *   *   *   *   *

(e) Self-Graded Cattle. Defense Supplies Corporation will make payment on approved basic claims for cattle which report cattle by grades as graded by the applicant's own graders, if the applicant has an exemption to grade his own beef, at the applicable separate grade rates set out above in paragraph (d) of this section, but the total amount of the claim before deductions on account of cost of cattle under Section 703.6(b) of this regulation shall not exceed the total number of pounds, live weight, (less condemnations) of cattle slaughtered, multiplied by the following maxima:

(1) Claims reporting cost. One and nine-tenths cents ($0.019) on claims reporting cost of cattle."

[3] The foregoing concise statement of the case is adopted from complainant's brief.

[4] 50 U.S.C.A.Appendix, § 901 et seq.

order to decide whether the determination, or order, of the Reconstruction Finance Corporation was in accordance with law, we have to interpret and apply the underlying regulation on which complainant's subsidy claim was denied. Since the protest did not challenge the validity of the provisions of the regulation, we must take them, as written, as the law of the case; and merely interpret them to see whether, under their terms as properly interpreted, complainant has made out a case for the higher subsidy. It the interpretation of the Reconstruction Finance Corporation was correct, then we would have to dismiss the present complaint, for, accepting the regulations as the governing law, we would be obliged to say that the subsidy claim was properly denied. If, however, such an interpretation would render the regulation invalid as arbitrary and discriminatory, or subject to grave doubts as to validity, while the interpretation contended for by complainant would avoid such doubts or conclusions of invalidity, and accord with reasonable construction, in keeping with the purposes of the Price Control Act, we would adopt the interpretation for which complainant contends. As presented by complainant's contention, the controversy brings before us the issue whether the regulations as interpreted by respondent, are invalid, or whether valid according to the interpretation of complainant.

Before proceeding to the discussion of the interpretation of the regulation, we revert to the statement of the case. The factual situation in somewhat more detail than has been above set forth, is this: Complainant, a slaughterer of the higher grades of meat, had, as a result of his application duly filed, an official grader of the Department of Agriculture at his plant for the purpose of grading his meat. As a result of such grading of the meats, complainant was entitled to a cash subsidy of $3.00 per hundredweight on the highest grade of meat slaughtered by him, and less on a descending scale, for five other grades of meat. On December 26, 1945, complainant was informed by the Department of Agriculture that the services of the official grader were not immediately available,

"and until such services are available you are permitted to grade all beef, veal and lamb slaughtered in your plant, in accordance with O.P.A. maximum price regulations 169 and revisions. For the purpose of clarification, we wish to state that slaughterers operating with a letter of exemption from requirements of an official grader assume the responsibility of correct interpretation and application of the Federal Grade Standards as set forth in the above stated regulations." On January 21, 1946, the Department of Agriculture informed complainant that "we will resume grading effective Thursday, January 24, 1946 as per old schedule." Later, on May 7, 1946, the Department of Agriculture disclosed the reason why the official grader had not been available. "Due to the illness of Meat Grading personnel during the period of December 26, 1945 to January 24, 1946, this department was unable to assign a meat grader to your establishment. In lieu of official grading at that time, we issued a letter of exemption to you, permitting you to grade your own beef, veal and lamb until such time that grading service was available again."

For the portion of the month of December during which the official grader was not available and complainant was obliged to do his own grading, complainant filed a claim for subsidy and received the same in the amount granted for meats graded by an official grader. For the portion of the month of January, 1946, during which complainant was granted permission to grade his meat, because of the absence on account of illness of the official grader, complainant filed a similar claim for subsidy, but was allowed only the lesser subsidy in the amount granted for meat graded by a slaughterer. If the meats had been graded by an official grader, complainant would have received an additional $13,130.42 for the first twenty-one days of January. It is this amount that he seeks by his protest and these proceedings to review denial of his protest.

Complainant declares that it is admitted for the purposes of this case that during the period involved herein, the meat was properly graded by the complainant

and given the same grades which would have been given had it been graded by an official grader. Respondent emphatically denies such admission. However, complainant set forth the claim in his protest and petition for review, and respondent merely answered that such a showing would be irrelevant. Complainant was permitted to introduce evidence to support his claim in this regard and filed numerous proofs which are not questioned by respondent, to the effect that many merchants and others who purchased meat from complainant during the period in controversy ascertained that the meats were either perfectly graded by complainant, or, in some cases, graded lower than the actual quality and grade of the meat. Among these proofs, appears the declaration of the War Department that 195,232 pounds of beef, purchased from complainant during the period in question, were subsequently graded by Army experts and corresponded exactly to the grades given by complainant. From the foregoing, we can fairly conclude that complainant has substantiated his claim that the meat graded by him during the absence of the official grader corresponded to the grade which would have been properly given by an official grader.

There are two regulations involved in this case—Maximum Price Regulation 169,[5] and Revised Regulation No. 3, Defense Supplies Corporation.[6] Maximum Price Regulation 169 placed a ceiling on the wholesale price of slaughtered meat. This ceiling price made it impossible for non-processing slaughterers such as complainant to operate at a profit. However, it was of the utmost importance to the nation to secure a large production of meat and, in order to do this, under the limitations of ceiling prices, the government, by Revised Regulation No. 3, Defense Supplies Corporation, provided for a cash subsidy to be paid to all non-processing slaughterers, payable per pound for all meats slaughtered. Section 7003.5(d) of the above mentioned regulation of the Defense Supplies Corporation, provides, as has been observed, for the higher subsidy for meats by an official grader; and Section 7003.5(e) provides for the lower subsidy to self-graders. Complainant herein is entitled to subsidy payment under one or the other of the above named sections of the regulation of the Defense Supplies Corporation.

Complainant was able to do business with the payment to him of the higher subsidy of $3.00 per hundredweight, payable for meats graded by the official grader. He could do business only at a loss with the lesser subsidy of $1.90, payable, according to the regulation, for meats graded by the slaughterer himself, inasmuch as such a low subsidy for the highest grade of meat was insufficient to enable him to continue his operations. Prior to the occurrences giving rise to this controversy, complainant had an official grader at his plant to do the grading. He had requested, desired, and applied for such grader. He purchased the best quality of cattle for slaughter, relying upon the higher subsidy which the government paid for the better grades of meat. A $3.00 subsidy was considered by the government as the *necessary* subsidy for a valid price ceiling for the class of nonprocessing slaughterers to which complainant belonged. If, in answer to an application for an official grader, the slaughterer is given the reply by the Department of Agriculture that such a grader would not be furnished and that the applicant would, therefore, be placed in the category of self-graders, he would be able to operate as a slaughterer of lower grade meats and conduct his business on that basis. For such a slaughterer could operate at a profit. But a slaughterer of high grade meats, selling at the ceiling prices of such meats, would need the higher subsidy to remain in business, and, in order to secure the higher subsidy, he would be obliged to come under the classification of slaughterers whose meats were officially graded. Thus, it is only the slaughterer who is assured of the services of an official grader who can deal in high grade meats without the risk of sudden and catastrophic loss; and it is the slaughterer who knows that the services of an official grader are not to be supplied to him and who, therefore, is given the exemption to grade his own meat, who can carry on successful

<hr>

[5] 10 F.R. 6182; 10 F.R. 15416.

[6] 10 F.R. 11154.

operations by dealing in lower grade cattle as he knows what his subsidy will be and can do business accordingly.

We cannot escape the conclusion that it is impossible to justify the distinction which respondent seeks to make between a slaughterer of the highest grade of meat who has an official grader to grade his meat and thereby receive a cash subsidy of $3.00 per hundredweight, and, on the other hand, a slaughterer of the same high grades of meat who applies for and is entitled to have an official grader to grade his meat—and who actually secures such services—but who, because of temporary illness or absence, or indisposition of such a grader, is thereby directed and required to grade his own meat, and thus is limited to a subsidy of only $1.90 per hundredweight. It is, however, asserted by respondent that there is no vested interest in obtaining the higher subsidy. But there is, nevertheless, an obligation on the part of the government, acting through the agency here in question, to treat alike all slaughterers who are in the same position. If, because of fortuitous circumstances, a slaughterer of high grade meat is deprived of the subsidy which is provided for such grades, merely because one of the official graders happens to be ill, and such a slaughterer is thereby reduced to bankruptcy, although other slaughterers of the same type, through the good luck of having an official grader who is not susceptible to temporary illnesses, secure the subsidies and are able to continue in business, such a result would be, in effect, discriminatory, unfair, and unjust, and a regulation compelling such a state of affairs would be arbitrary and unreasonable.

■ Moreover, one of the principal objects of the Emergency Price Control Act was to increase production, to eliminate and prevent disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency.[7] It was specifically provided that whenever the Administrator determined that the maximum necessary production of any commodity was not being obtained, he might make subsidy payments in order to obtain the maximum necessary production thereof.[8] This purpose was continually and repeatedly expressed through the various regulations, executive orders, and directives of the different agencies concerned: to insure the necessary maximum production of meat and food by subsidies or other assistance or helpful conduct on the part of the government.[9] The interpretation of the regulation sought by respondent would tend to bankrupt many concerns engaged in producing meat. It would, moreover, induce slaughterers who were temporarily deprived of the services of an official grader to withhold their higher grades of meat from the market. Such an interpretation would not only be unfair and discriminatory with respect to complainant, and slaughterers similarly situated, but would constitute an obstacle to accomplishing the very purposes of the Act. The regulation, if interpreted in the manner sought by respondent, would be invalid.

■ We come, then, to the construction of the regulation, as proposed by complainant. The following is the basis upon which an interpretation is sought to uphold the validity of the regulation and to sustain complainant's contention: Complainant submits that the original Regulation No.3,[10] Defense Supplies Corporation, effective June 7, 1943, provided for 1.1 cents subsidy per pound for cattle and calves live weight, without making any provision for grading; that on October 25, the Office of Price Administration issued its directive[11] requiring that self-graded meats should be paid at the then present subsidy, but that government meats should be paid at a higher rate; that Defense Supplies Corporation then issued Amendment No. 3 [12]

---

[7] 50 U.S.C.A.Appendix, §§ 901(a) and 902(e).

[8] 50 U.S.C.A.Appendix, § 902(e).

[9] Executive order 9250, 50 U.S.C.A.Appendix, § 901 note, 7 F.R. 7871; Executive order 9328, 50 U.S.C.A.Appendix, § 901 note, 8 F.R. 4681; Executive order 9599, 50 U.S.C.A.Appendix, § 1651 note,

[10] F.R. 10155; Directive of Office of Economic Stabilization, Live Stock Slaughter Payments, October 25, 1943, 8 F.R. 14641.

[10] 8 F.R. 10826.

[11] 8 F.R. 14641.

[12] 9 F.R. 1821.

to Regulation No. 3, effective December 18, 1943, which added subparagraph 15(c) to Section 7003, and provided for a subsidy for officially graded beef at specific rates set out in the subparagraph, and a flat subsidy of one cent per pound for self-graded beef in the following terms:

"Every applicant who reports his cattle slaughtered by grades in accordance with paragraph (b) of this section, shall report the carcass grades as determined by an official grader of the United States Department of Agriculture, *unless the applicant has applied for grading by such an official and has been refused such grading in writing since July 1, 1943.* If an applicant reports by carcass grades determined by his own graders, payment shall be made by grades at the separate grade rates, but the total payment shall not exceed the total number of pounds, live weight, of cattle slaughtered, multiplied by one cent ($0.01) a pound." (Emphasis added)

Regulation No. 3, with all its amendments, subsequently emerged as Revised Regulation No. 3, effective January 25, 1945, with which we are here concerned. This Revised Regulation, as counsel for complainant demonstrates, combined the substance of subparagraph 15(c), last above quoted, in subparagraphs 7003.5(d) and (e) of Revised Regulation No. 3, to read, except for the rates of subsidy, substantially as they did in December, 1945, and January, 1946. In addition, the Revised Regulation contained Section 7003.7, which reads in part as follows:

"(a) *Reporting by Grades:* Any applicant who has his beef graded by an official grader of the United States Department of Agriculture or *who has applied for such grading and been granted an exemption* to grade his own beef may report his cattle by grades." (Emphasis supplied)

What, then, was the intention of the framers of the regulation, with respect to grading, as evidenced by the provisions of the regulations themselves, the amendments thereto, and the practice followed out in this case?

When mention of self-grading first appeared in the original Regulation No. 3, it was provided that grading by an official grader was mandatory upon all who reported by grades "unless the applicant has applied for grading by such an official *and has been refused* such grading *in writing* since July 1, 1943." (Emphasis supplied) (Section 7003.15(c) of original Regulation No. 3.)

In Revised Regulation No. 3, those who reported by grades were distinguished. One type was "any applicant who has his beef graded by an official grader of the United States Department of Agriculture;" the other was a different type—"or who has applied for such grading and been granted an exemption to grade his own beef." (Section 7003.7)

Counsel for complainant point out with perspicuity that the foregoing sections indicate that the regulation for payment of subsidies for large stock slaughterers provides for only two kinds of grading: (1) grading by an official grader; and (2) self-grading by a slaughterer who has applied for an official grader and has been refused and has thereafter been granted an exemption to grade his own beef. Section 7003.5 (d) providing for the higher subsidies would, therefore, apply to the first class above named, and Section 7003.5(e) referring to those who "report cattle by grades as graded by the applicant's own graders, if the applicant has an exemption to grade his own beef," and providing for the lower subsidy, would apply to the second class above named.

Complainant did not operate, even during the absence of the official grader, under any "exemption," as that term is used in the regulation. The whole purport of the original regulation and its amendment is that an "exemption" is granted only when official grading is applied for and refused, or, as might otherwise be expressed, where an application for official grading is made and the agency grants instead the right of self-grading. Such procedure has no application to the facts in this case. Complainant did not receive a right of operation other than that which he applied for. His application was for an official grader, and he was granted an official grader. He was never given the right of self-grading *as an alternative* to an official grader. When the

Department of Agriculture informed complainant that it could not supply the official grader during the last four days of December, 1945, and part of January, 1946, because of illness of personnel it advised him that, *until such services were again available,* he was permitted to grade his meat "in accordance with O.P.A. maximum price regulation 169 and revisions." Maximum Price Regulation 169 does not mention "exemptions." It provides that no person shall sell any beef, unless it has been examined by an official grader of the United States Department of Agriculture, except where the person is unable to procure the services of an official grader within twenty-four hours after such person has made application for such grading. In such a case, it is provided that the beef may be graded by the seller in the same manner as official grading for so long a period as the Department of Agriculture certifies in writing that it is unable to provide such person with the services of an official grader. It appears from the letter of the Department of Agriculture to complainant that he was being given permission to grade his meat, *temporarily,* and *that it was intended that such grading should be equivalent to that of an official grader, during that period,* as provided in Section 1364.411 (c) (2) (i) of Maximum Price Regulation 169, to which the Department referred, and which was to govern the grading.

It is also emphasized by counsel for complainant that, for the four days in December, 1945, during which he was granted permission to grade his meat, respondent paid complainant the subsidy for officially graded meat and, therefore, can be said to have interpreted the regulation at that time as complainant insists it should now be interpreted. To this argument, respondent says that it paid the higher subsidy because it did not feel justified in requiring complainant to make two reports for the month. However, payment by respondent to complainant of the higher subsidy—in the amount of $2,425.00 for four days' grading, without any question or objection, substantiates complainant's contention that respondent itself, at that time, construed the regulation as entitling complainant to the higher subsidy for the temporary self-grading which he carried out upon the instructions of the Department of Agriculture.

Considering the language and intent of Maximum Price Regulation 169 and the permission given by the Department of Agriculture to complainant to grade his meat in accordance therewith; the provisions of the original Regulation No. 3, and Revised Regulation No. 3 of the Defense Supplies Corporation; the fact that complainant was not operating under an "exemption," as that term must be construed in the regulation of the Defense Supplies Corporation; that the interpretation of the regulation which is sought by respondent would result in its invalidity; and that the interpretation of the regulation as contended for by complainant is reasonable, avoids injustice, and is in keeping with the purposes of the Emergency Price Control legislation: We conclude that complainant, during the period he temporarily graded his meats on direction of the Department of Agriculture during the illness of the official grader, is entitled to the subsidy provided for officially graded meat under Section 7003.5(d) of Revised Regulation No. 3, Defense Supplies Corporation.

A judgment will, therefore, be entered setting aside the order of the respondent denying such claim of subsidy and remanding the case to the Reconstruction Finance Corporation for further proceedings not inconsistent with this opinion.